IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 26, 2008

**MICHAEL S. POWELL v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 247239    Don W. Poole, Judge**

_____

**No. E2007-01586-CCA-R3-PC - Filed December 22, 2008**

_____

A Hamilton County jury convicted the Petitioner, Michael S. Powell, of count one, first degree felony murder, with the underlying felony being aggravated child abuse, and of count two, aggravated child abuse. The trial court sentenced him to concurrent sentences of life in prison for the murder conviction and twenty years for the aggravated child abuse conviction. The Petitioner filed a petition for post-conviction relief claiming that he received the ineffective assistance of counsel. After a hearing, the post-conviction court dismissed the petition. The Petitioner appeals that dismissal, contending that his trial counsel was ineffective for failing to request that a mental evaluation be conducted on the Petitioner. Finding no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Cynthia A. LeCroy-Schemel (at post-conviction hearing), and Jason D. Demastus (on appeal), Chattanooga, Tennessee, for the Appellant, Michael S. Powell.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Renee W. Turner, Assistant Attorney General; William H. Cox, III, District Attorney General; Neal Pinkston, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

A Hamilton County Grand Jury indicted the Petitioner for one count of first degree felony murder, with the underlying felony being aggravated child abuse, and a second count of aggravated child abuse. In our opinion on the Petitioner's direct appeal, we summarized the

evidence presented at trial as follows:

On the night of January 8, 1999, the Defendant was home with his girlfriend, the victim's mother, and the victim, three-month-old Trevor Chase Holland. The baby was asleep in his carseat; the baby's mother was also asleep. When Trevor began crying, the Defendant removed him from his carseat and took him into the bedroom. The Defendant testified at trial about what next occurred:

Anyway, he began to scream and I went into the bedroom, I tried to suffice him. I tried to give him a bottle, tried to comfort him. Nothing worked. He kept screaming. He kept screaming. And there was some napkins laying on a cabinet that I had in the bedroom and I picked one of them up and I wadded it up and that's when I put it in his mouth, just to try to quiet him down, because I was just so frustrated with him for the last two nights not having any sleep. And I put the paper in his mouth. Never, never intentionally meaning to harm the child.

At that point, the Defendant testified, the baby stopped crying. The Defendant then tried to remove the paper, but "couldn't pull it out because [he] had pushed it in too far." He kept trying to scoop the paper out with his finger, he testified, but was unable to remove it. He then tried using the earpiece of a pair of sunglasses to remove the wad of paper. Unsuccessful, the Defendant called 911.

Upon reaching the 911 dispatcher, the Defendant stated, "Our little baby has got something hung in his throat and he can't breathe." When asked what the baby had in his throat, the Defendant stated, "I have no idea." Later in the call, the Defendant told the dispatcher "it looks like there's paper or something back in the back of his throat." The Defendant never told the dispatcher how the paper came to be in Trevor's throat.

Paramedic Ed Griffits was the first responder on the scene. When he arrived the baby was not breathing and had no pulse. The Defendant made no effort to explain to Mr. Griffits what was obstructing the baby's airway. Mr. Griffits was unsuccessful in his attempt to intubate the baby, explaining that his throat "looked like hamburger meat." Mr. Griffits transported the baby to the hospital, where Dr. Ralph Smith took over Trevor's care.

Dr. Smith testified that, by the time the baby arrived in the emergency department, he "had been without oxygen for a significant period of time." Dr. Smith examined the baby's mouth but was unable to see the wad of paper because of its location. Dr. Smith intubated the baby but was unable to revive him. After pronouncing Trevor dead, Dr. Smith performed a "babygram," which

is a full-length x-ray of the baby's body. In examining the s-ray, Dr. Smith discovered that Trevor's left femur (thigh bone) was fractured in multiple places. There was also a fracture to the left tibia (shinbone) near the ankle. Dr. Smith's diagnosis of Trevor's injuries included a finding of child abuse.

Dr. Marilyn Gay Murr Doyle performed the autopsy on Trevor. She described the cause of death as follows: "This three-month-old, white, male infant died as a result of a foreign body in the esophagus which compressed against the trachea causing suffocation and asphyxiation." Dr. Doyle testified that she removed a wad of paper measuring two and one-quarter inches by one and one-quarter inches by five-eighths inch from Trevor's esophagus. She further testified that a normal esophagus in a child of Trevor's size was approximately three-eighths inch by one-eighth inch. The wad of paper was located in the esophagus at a level below the child's Adam's apple, behind his windpipe. Dr. Doyle testified that the wad of paper was so large that it caused the esophagus to rip and rupture. She stated that it was impossible for the child to have gotten the paper that far into his throat by himself, and described the wad as having been "crammed" into the baby's esophagus. In her opinion, Trevor's death resulted from a homicide.

Dr. Doyle also testified about the broken femur, explaining that, in her opinion, the injury was no more than twenty-four hours old.

Dr. Deloris Rissling, a radiologist, testified that the fractures to Trevor's femur and tibia were no more than five day sold, and probably less. She stated that there was no way the child could have caused these fractures to himself. She further opined that the fracture to the tibia was "characteristic of child abuse."

Detective Tommy Woods took two recorded statements from the Defendant, both of which were admitted at trial. In his first statement, taken several hours after Trevor's death, the Defendant denied having done anything injurious to the child, and speculated that the baby might have picked up some toilet paper that had been scattered by his older brother, and then placed it in his own mouth. After the autopsy, the Defendant explained in his second taped statement that he had used a few squares of toilet paper to wipe off the baby's gums, and that the paper had accidentally gotten into the baby's throat. Detective Woods also testified that the Defendant made another, unrecorded statement to him, in which the Defendant admitted placing toilet paper in Trevor's mouth in order to quiet him.

Dr. Steven Frank Dutton testified on behalf of the defense. Although he did not examine Trevor's body, he examined the autopsy report and the related photographs and x-rays. He agreed that Trevor died "because he had a paper napkin that was shoved down his throat," but stated that his findings were

consistent with someone forcing something into the baby's mouth and then trying to remove it. In his opinion, the lacerations to the esophagus could have been caused by the earpiece of a pair of sunglasses used in an attempt to retrieve the wad of paper. Dr. Dutton further opined that the fracture to Trevor's femur was eleven to fifteen days old. On cross-examination, Dr. Dutton agreed with the prosecutor that forcing a napkin into Trevor's mouth constituted child abuse.

*State v. Michael Shane Powell*, No. E2001-01544-CCA-R3-CD, 2002 WL 1465922 (Tenn. Crim. App., at Knoxville, July 9, 2006), *perm. app. denied* (Tenn. Dec. 9, 2002). This Court affirmed the Petitioner's conviction and sentence on appeal. *Id.* at *1.

The Petitioner filed a petition for post-conviction relief, alleging that his trial counsel was ineffective for failing to request a mental evaluation be conducted on the Petitioner. At the hearing on his petition, the following relevant evidence was presented:[1] The Petitioner's trial counsel ("Counsel") testified that he recalled that the Petitioner's mother contacted him about this case. He turned it down several times because he had recently left the prosecutor's office where he had prosecuted several infant death cases. The Petitioner's mother implored him to consider taking the case, and he ultimately agreed. Counsel said he met with the Petitioner's mother on three occasions before he met the Petitioner. At his first meeting with the Petitioner, he explained his history as both a prosecutor and a defense attorney. The Petitioner, who was a Sheriff's Deputy at the time, said he understood and agreed to have Counsel represent him.

Counsel testified that, during the course of representing the Petitioner, he retained an investigator and also retained the services of a forensic specialist. Counsel felt that a medical expert was necessary, in part, because the State's medical examiner, Dr. Murr-Doyle, seemed to have been personally affected by this case. He felt that Dr. Murr-Doyle was going to do "everything in her power to convict [the Petitioner]."

Counsel said he noticed that, as the trial date approached, the Petitioner appeared to be under "a lot of stress." At one point, Counsel requested that the Petitioner's family physician be allowed to examine the Petitioner while the Petitioner was in jail to see if there needed to be a change in the Petitioner's medications. Counsel denied that he said the Petitioner should be on Xanax.

Counsel estimated that he met with the Petitioner between fifteen and twenty-five times, enough, he said, that he "felt [he] had good control of the case." Counsel said that the Petitioner had previously worked in a jail, and he therefore seemed to adapt to jail life relatively well. As

---

[1] The Petitioner raised numerous allegations in his post-conviction petition and much of the testimony at the post-conviction hearing explored those allegations. On appeal, the Petitioner asserts only that Counsel was ineffective for failing to request a mental evaluation of the Petitioner be performed upon the Petitioner. In our summary of the facts, we provide some background but intentionally limit our facts to those most relevant to the Petitioner's appeal.

the trial neared, the Petitioner's stress level increased in a manner Counsel found appropriate considering the seriousness of the charges against him.

Counsel testified that he enlisted the aid of Jerry Morris as an investigator in the Petitioner's case. Counsel's copy of Morris's file showed that Morris did an educational background, as well as an employment and marriage history, and a medical/mental history of the Petitioner.

About the Petitioner's mental history, Counsel testified that Morris's report noted that the Petitioner had been diagnosed as bipolar and had been seeing a psychiatrist and psychologist at the time of the report. Further, the report noted that the Petitioner had seen Drs. Simpson, Klein, Holmes and Gibson. Counsel said that, if there were phone numbers in Morris's file, he would have contacted the doctors to interview them. He agreed that he did not have documentation stating when and how he contacted the doctors. Counsel said, however, that he discussed the issue of whether the Petitioner was bipolar at length with the Petitioner and his mother, and they took this issue into account when they determined their trial strategy. The fact that the Petitioner's medication had been increased was also a matter that they discussed in preparation for trial. Counsel said that he believed he received medical records from the Petitioner's doctors before the State gave him copies as part of discovery. Counsel recalled that he and the Petitioner discussed that the Petitioner had suffered from meningitis as a teenager, but he did not recall whether the illness put the Petitioner in a coma.

Counsel reiterated that the Petitioner seemed "stressed" before trial, but Counsel felt it was an "appropriate reaction" to the situation. Further, Counsel explained that the Petitioner told him that he was having a problem with his medications, which led to Counsel's request to have a physician see the Petitioner in jail. Counsel said that the Petitioner's competency and sanity were not an issue. Counsel and the Petitioner discussed the Petitioner's mental health at length, and the Petitioner clearly told him that he did not want to run "some sort of BS psychiatric defense on the case." Counsel said the Petitioner admitted that he had been consuming drugs and alcohol periodically for forty-eight hours before this killing. Further, the Petitioner said that he put the toilet paper in the baby's throat and then tried to get it out and could not. He then used his sunglasses to try to retrieve the paper from the baby's throat. Counsel recalled that the Petitioner felt that it was a better trial strategy to tell the jury that what had happened was a mistake and an accident as opposed to blaming it on being bipolar and not having taken his medication. Counsel reiterated that he discussed this at length with both the Petitioner and the Petitioner's mother.

On cross-examination, Counsel testified that, during his representation of the Petitioner, he had asserted an insanity defense in his defense of another client. He said that his office was "quite familiar with the insanity defense and how to successfully advance it." Further, Counsel testified that he asserts the insanity defense when it is appropriate, but both he and the Petitioner did not feel that it was a legitimate defense in this case. Counsel found the Petitioner "lucid, clear-thinking, [and] understanding [of] the situation before him," and opined that "[The Petitioner] had a full understanding of the law." Counsel said that he thought the Petitioner was in the top five percent of all clients that he had ever represented in his understanding of how the

courts work, the administration of justice, and procedure.

Mary Ann Green, an assistant district public defender, testified that she had been practicing law for over twenty-six years. She said that the normal procedure when an assistant public defender is assigned a case is to complete, or have an investigator complete, an intake sheet, which includes extensive notes on the person's mental and psychological history. If a client had a mental health problem or a prior mental health history of some sort, Green would have the client sign releases and would request his mental health records. Once the records were obtained, Green evaluated them in terms of whether the defense needed expert services and whether a forensic evaluation would be appropriate. With regard to the Petitioner, Green testified that "red flags would have gone up" when she noticed that the Petitioner had a history of bipolar disorder and when she saw that he had meningitis as a child, which is a disease that can leave far-reaching after-effects. Green would also have been concerned if the Petitioner's doctor had requested that his medication be increased. Green said that, when she interviewed the Petitioner, she learned that he had a history of "closed head injuries," which could result in brain trauma.

Green testified that she would have looked for a neuropsychologist to test the Petitioner so that they could determine exactly what mental issues he had. His closed head injuries and meningitis could have resulted in his not making "very good decisions." Further, Green would have wanted the expert to consider that the Petitioner had been diagnosed as bipolar and that he was taking medication for this disorder immediately before the incident. Green testified that the Petitioner had also been seen by a psychiatrist before this killing and that his last treatment session was the month before this incident. She said that these factors would lead her to seek the services of a "good neuropsychologist" to interview and test the Petitioner. Green said that she "wouldn't care what the [Petitioner] said about not wanting to put his mental health history in front of the court," explaining that it was not up to the Petitioner to decide whether she would obtain an expert's services because she had an obligation to look at every possible defense. She testified that any mental health issue might have risen to the level of diminished capacity.

Green further testified that the Petitioner told her that he had "pretended" to have injuries in order to be prescribed pain medication since the age of fifteen or sixteen. She classified this as an "extremely serious" addiction problem. Green said that she may have consulted another expert, an "addictionologist," with regard to the Petitioner's behavior.

Green opined that Counsel's decisions for trial were only as good as the information that they were based upon. If Counsel based his decision on information that was incomplete, then his decisions may not have been sound.

Green stated that her office does not destroy files. Further, if the client requests a document from the file, the document is usually copied and the original is given to the client, with the copy of the document being retained in the file. Alternatively, when no copy is retained, a memorandum is drafted stating what documents were taken from the file by the client, and the memorandum is placed in the file. Green said that this procedure was followed when Green was in private practice as well. Green stressed the importance of keeping the files

for future proceedings, such as post-conviction proceedings.

On cross-examination, Green testified that she never represented the Petitioner in general sessions court but that someone from her office had. She did not review the Petitioner's file at that point, and she had only recently reviewed it in anticipation of this court case. She assumed that the public defenders representing the Petitioner only gathered documents in anticipation of the preliminary hearing. They would not, before having the documents, order a mental evaluation or enlist the aid of experts. Shortly after the preliminary hearing, Counsel was retained, and her office was no longer involved in the case. Counsel reviewed the public defender's file, and Green thought that he should have been aware of the "red flags" after that review. She admitted that she did not share any of her concerns with Counsel.

Dr. Robert W. Brown, who the parties stipulated was an expert neuropsychologist, testified that he interviewed the Petitioner on three separate occasions, each interview lasting the "better part of the day." The interviews were extensive, and they included the Petitioner's completion of a variety of psychological tests. The doctor also reviewed court transcripts and records from the clinic where Drs. Homes and Klein treated the Petitioner. Further, Dr. Brown reviewed records from Dr. Gibson, a neurologist, and Dr. Simpson, a general practitioner. After meeting the Petitioner, Dr. Brown obtained records from a medical facility in Houston.

Dr. Brown said that, within minutes of meeting the Petitioner, he observed what he thought were some "serious neurobehaviorial performance problems." The doctor said that he contacted the Petitioner's post-conviction attorney and told her that the Petitioner was being treated for bipolar disorder but that the treatment was not satisfactory because the doctor suspected that he had some serious brain dysfunction. Dr. Brown became concerned and met with the Petitioner's mother, who informed him about the Petitioner's previous head injuries and bout of meningitis.

The doctor said that the Petitioner's post-conviction attorney asked him to evaluate the Petitioner's competency to stand trial, his mental condition at the time of the crime, and whether there was any evidence to support diminished capacity. He then described the tests that he performed on the Petitioner and testified that, based upon those tests, he was of the opinion that there was no evidence that the severity of the Petitioner's mental conditions prevented him from appreciating the nature or wrongfulness of his actions on the day of the killing. Further, he found nothing indicating that the severity of the Petitioner's mental conditions prevented him from possessing a culpable mental state on the day of the killing. The doctor concluded, however, that the Petitioner's "competency to stand trial performance in 1999 was compromised by his mental condition," which was not adequately diagnosed or treated at the time. The doctor thought that, at the time of the post-conviction hearing, the Petitioner possessed only "marginal capacity" to stand trial, and his testimonial competency was questionable. Finally, Dr. Brown concluded that the "extent and severity of [the Petitioner's] multiple mental conditions may be considered to be mitigating factors in regard to his actions" on the day of the killing.

Dr. Brown testified that, while he was not present at the Petitioner's trial in October of 2000, his testing of the Petitioner in 2005 led him to his conclusions. Dr. Brown said that, while

the Petitioner stated he had the utmost respect for his treating psychiatrist Dr. Reddy, Dr. Reddy repeatedly noted that she was not satisfied that she provided adequate treatment of all of the Petitioner's mental health issues. Dr. Brown said that the Petitioner felt he was competent to stand trial, but Dr. Brown thought the Petitioner had no "insight into any of his cognitive problems," which "raise[d] questions about higher mental functions . . . needed to provide an adequate defense."

Dr. Brown said that, in the time between his first meeting with the Petitioner and the post-conviction hearing, the Petitioner had become "more agitated, more irritable, and more reactive to the court scenario and the possibility of testifying" than he was in 2005. The Petitioner's TDOC records indicated that doctors were still refining his medication regimen. Dr. Brown indicated that, although this meant the Petitioner was receiving better treatment at the time of the post-conviction hearing than that which he received in 2005, the Petitioner still suffered from "so many problems."

Dr. Brown opined that the Petitioner's neuropsychological problems could not be accounted for by his two diagnoses: bipolar disorder and obsessive/compulsive disorder. Therefore, the doctor thought that the Petitioner's previous bout with meningitis was "an important piece" of his medical history. It appeared from the Petitioner's medical history that he had been in a coma for some period of time as a result of his meningitis.

Dr. Brown testified that he reviewed Dr. Simpson's records about treating the Petitioner, and he found notes that Counsel had contacted Dr. Simpson about whether there was an issue with the Petitioner standing trial. Dr. Simpson's notes led Dr. Brown to conclude that the Petitioner suffered symptoms at the time of trial that were similar to the symptoms the Petitioner presented when Dr. Brown evaluated him. Dr. Brown questioned whether the Petitioner was even competent to participate in the post-conviction procedure.

The doctor described one incident where the Petitioner became extremely irritable when shown an ink blot card. After the Petitioner calmed down, the doctor inquired about why he had become so upset. The Petitioner said that he was upset because he did not know what was expected of him, and he wanted to do the right thing. During that same interview, the doctor noted that the Petitioner had poor attention and was easily distracted. Dr. Brown opined that he had his "doubts" that the Petitioner "c[ould] . . . process the information he need[ed] to present a coherent defense."

The doctor noted that the Petitioner offered multiple stories to both the police and himself about what happened with regard to this incident. Dr. Brown said that his tests revealed that the Petitioner "confabulates," meaning that the Petitioner does not arbitrarily come up with misinformation to mislead people but that his brain does not have an accurate representation of reality. Further, the Petitioner does not know that he is demonstrating this when he is completing the tests that have nothing to do with the charges against him. With a person such as the Petitioner, the doctor questioned the accuracy of information the Petitioner could present in his defense when testifying. The doctor also noted that the Petitioner was a highly obedient, dependent, passive child, who later committed an act of violence. He opined that brain damage

was the only way to "make sense" of this change. Dr. Brown said that the Petitioner's competence at the time of the post-conviction hearing was "marginal." He believed that the Petitioner was also not competent, or only "minimally competent," to stand trial in 2000, in light of the Petitioner's aggressive response to stressful or conflicting stimuli. The doctor agreed that there was no support for an insanity defense, although he diagnosed the Petitioner as having a bipolar disorder with a psychosis.

On cross-examination, Dr. Brown testified that he examined the Petitioner for three sessions in 2005 and that the sessions were essentially full day examinations. Dr. Brown testified that in only five to six percent of cases was a defendant successful in asserting that his mental illness and/or defect was so severe as to prevent his appreciation of the nature of the wrongfulness of the actions. The doctor reiterated that, while he did not think that the Petitioner met the qualifications for the insanity defense, he thought that the Petitioner met only the "minimal standards of competency" to stand trial.

Dr. Brown testified that he asked the Petitioner during the examinations if the Petitioner had ever before been tested by a psychologist. He did not recall whether the Petitioner said that he had been so tested for his law enforcement job. Dr. Brown noted that such law enforcement testing was "very limited."

On redirect examination, the doctor noted that the criminal negligence statute requires a deviation from the standard of care of an "ordinary person." He expressed concern that the Petitioner was not an ordinary person, because the Petitioner's brain changed significantly following a bout with spinal meningitis when he was 14 years old. The Petitioner, the doctor said, was a person who could act with "very abrupt impulsive behavior, who isn't adequately screening his environment, isn't adequately conceptualizing the potential risk or harm or danger of the situation that he's in." The doctor noted that the Petitioner said that he did not call 9-1-1 immediately after this incident because he had medical training as a law enforcement officer, which demonstrated to the doctor that he had no recognition of the risk facing the Petitioner as a result of his actions. Further, at the time of the interview, the Petitioner still did not appreciate the risk presented by his situation.

Dr. Brown testified that the Petitioner chose to testify because he had a childlike moral sense. The Petitioner thought that if he told the truth people would have mercy on him, which is an "extremely naive position." The doctor also agreed that, at the time of his interview with the Petitioner, the Petitioner had been receiving treatment and medication for approximately six years. The doctor opined, however, that the mental problems and deficiencies displayed by the Petitioner at the time of the interview would have been the same at his trial in 1997.

Based upon this evidence, the post-conviction court denied the Petitioner's petition.

## II. Analysis

On appeal, the Petitioner contends that his trial counsel was ineffective for failing to request a mental evaluation of the Petitioner and that this failure prejudiced him. The Petitioner

argues that Counsel noted the Petitioner's stress before trial and contacted the Petitioner's personal physician. This, in combination with the fact that Counsel was aware of the Petitioner's "strong mental health issues" leading up to his trial, called for Counsel to seek a mental health evaluation for his client. The State asserts that the evidence supports the post-conviction court's ruling because Counsel was aware of the Petitioner's mental health issues but did not seek a mental evaluation based upon his and the Petitioner's strategic decision that claiming that the infant's death was an accident was a better defense than claiming the insanity or diminished capacity of the Petitioner. Further, the State asserts that the Petitioner presented no evidence supporting a claim of diminished capacity or an insanity defense at the post-conviction hearing.

The post-conviction court concluded the following:

> The petitioner claims that counsel was ineffective in not seeking a mental evaluation, thereby forcing him to waive viable theories of insanity and diminished capacity. Dr. Brown's testimony, however, does not support the claim with respect to insanity. Nor, though it is slightly contradictory, does it support the claim with respect to diminished capacity. Although Dr. Brown did suggest that the petitioner is, because of his brain dysfunction, not an ordinary person and therefore perhaps incapable of criminal negligence, the conviction offenses do not require criminal negligence or even knowledge of the injurious nature of one's treatment of a child. They merely require knowledge of one's treatment of a child. The court, however, cannot reasonably question the petitioner's knowledge of his conduct when Dr. Brown does not question the petitioner's sanity, *i.e.*, his knowledge of the wrongfulness of his conduct. It therefore finds no clear and convincing evidence that counsel's failure to seek a mental evaluation was prejudicial in either respect.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to de novo review by this Court; however, we just accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453,

461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688 (1984)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the case under submission, the post-conviction court based its denial of the Petitioner's claim upon its finding that Counsel's actions did not prejudice the Petitioner. The evidence does not preponderate against this finding. Dr. Brown very clearly testified that the Petitioner was not so mentally impaired as to qualify to assert an insanity defense. He further testified that the Petitioner was likely only "minimally competent" to stand trial in 2000 based upon his diminished capacity to testify. We agree with the post-conviction court that this is not sufficient proof that, had Counsel sought a mental evaluation, the result of the Petitioner's trial would have been different. Accordingly, the Petitioner has not met his burden of proof and is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE